[No. D054257. Fourth Dist., Div. One. Sept. 9, 2009.]

In re G.L., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
MICHAEL L., Defendant and Appellant.

684

## COUNSEL

Christy C. Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

John J. Sansone, County Counsel, John E. Philips, Chief Deputy County Counsel, Lisa M. Maldonado and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Carl Fabian, under appointment by the Court of Appeal, for Minor.

## OPINION

**IRION, J.**—Michael L. appeals a judgment declaring his minor daughter, G.L., a dependent of the juvenile court under Welfare and Institutions Code section 300, subdivisions (a) and (b), and removing G.L. from parental custody. Michael, an enrolled member of the Viejas Band of Mission Indians (Viejas tribe), contends the jurisdictional findings and dispositional order must be reversed because the court and the San Diego County Health and

Human Services Agency (Agency) did not comply with the notice provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) affecting the rights of the paternal grandmother, Mary W., who was G.L.'s Indian custodian. Michael further contends the court erred by declining to place G.L. with Mary under ICWA's placement preferences.

■ We conclude ICWA's notice requirements for an Indian custodian were not violated, and to the limited extent Mary's rights as G.L.'s Indian custodian were implicated, any error was harmless. We further conclude substantial evidence supports the court's finding that good cause existed to deviate from ICWA's statutory placement preferences. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 28, 2008, Agency filed a petition in the juvenile court alleging two-year-old G.L. was at substantial risk of harm because her parents had a history of substance abuse and domestic violence, and on May 6, 2008, Michael injured G.L. during a physical altercation he had with G.L.'s mother, Elena P. (Welf. & Inst. Code, § 300, subds. (a), (b).) The court held a detention hearing that day, but the whereabouts of G.L. and the parents were unknown. Because Michael was an enrolled member of the Viejas tribe and G.L. was eligible for enrollment, the court found ICWA applied and ordered Agency to send notice to the tribe. The court issued a pick up and detain order for G.L.

At the time of the jurisdiction hearing on June 18, 2008, the parents' whereabouts remained unknown. G.L., who was represented by counsel, was present in court. Mary was also present. The court sustained the allegations of the petition under Welfare and Institutions Code section 300, subdivisions (a) and (b), again found ICWA applied, and ordered Agency to evaluate all relatives for placement. At the conclusion of the jurisdiction hearing, G.L. was taken into protective custody. Mary gave the social worker G.L.'s belongings, as well as a form entitled "Designation of Indian Custodian," signed by Elena on May 22, 2008, transferring temporary care and custody of G.L. under ICWA to Mary and the paternal aunt, Amber L.

In a report prepared for the July 10 disposition hearing, Agency attached the Designation of Indian Custodian form signed by Elena. Agency also attached a letter from the Viejas tribe stating its preference for placing G.L. with Amber on the Viejas Indian Reservation. At the July 10 hearing, the court and counsel acknowledged and discussed Mary's Indian custodian status.

Agency recommended G.L. be placed in an Indian-approved foster home, but not with Amber or Mary because Amber did not want to care for G.L., and Mary did not pass background checks. Agency was also concerned about Mary's ability to protect G.L. because, in 2006, Mary was G.L.'s Indian custodian for a period of time and failed to protect G.L. from the ongoing violence between the parents. At the request of counsel for the Viejas tribe (tribal counsel), the court continued the disposition hearing.

At the continued hearing on July 21, tribal counsel argued that because Mary had custody of G.L. at the time the petition was filed, Agency was required to seek removal from her. On August 7, Agency filed a subsequent petition under Welfare and Institutions Code section 342, alleging Mary, G.L.'s Indian custodian, was aware of and failed to protect G.L. from severe domestic violence between the parents. Tribal counsel suggested the court appoint counsel for Mary on the subsequent petition because she became G.L.'s Indian custodian before the court made its jurisdictional findings. Agency acknowledged Mary could be entitled to counsel. The court continued the hearing to address the Indian custodian issue and ordered Mary to return.

At the time of the continued hearing on August 19, Elena filed with the court a document entitled "Revocation of Designation of Indian Custodian," revoking her transfer of G.L.'s care and custody to Mary and Amber. The court granted Agency's request to dismiss the Welfare and Institutions Code section 342 subsequent petition on the ground Mary was no longer G.L.'s Indian custodian.

On September 8, Agency reported that G.L. had been placed in an Indian foster home approved by a foster family agency but not by the Viejas tribe. Agency was still trying to locate a Viejas-approved foster home. Michael had not contacted Agency or visited G.L. in several months. In October 2008, Michael was arrested following a shooting incident on the Viejas Indian Reservation.

At a disposition hearing that began on November 20 and concluded on December 1, the court admitted into evidence a declaration by Indian expert Phillip Powers, stating active efforts had been made to provide remedial and rehabilitative services to the parents to prevent the breakup of the Indian family, and those efforts had been unsuccessful. Powers recommended the court declare G.L. a dependent and remove her from parental custody based on evidence G.L. would be at great risk of serious physical and emotional harm in her parents' care.

The social worker testified G.L. continued to live in the Indian foster home. The caregivers engaged in tribal cultural activities and had other

Indian children in their care. A foster home approved by the Viejas tribe had not been found. The social worker could not recommend placing G.L. with Mary because she had a criminal and child welfare history, and because she previously had had custody of G.L. and returned her to the parents even though she knew about the domestic violence. Agency could not waive Mary's 1995 conviction for "cruelty to a child" for purposes of placing G.L. with her.

Michael testified he wanted G.L. placed with Mary or other paternal relatives. He said he signed a Designation of Indian Custodian form on May 22, 2008, transferring custody of G.L. to Mary. He did not revoke the transfer and intended that Mary remain G.L.'s Indian custodian. The court admitted Michael's Designation of Indian Custodian form into evidence.

Mary testified she was present when both parents signed the Designation of Indian Custodian forms on May 22. G.L. was in Mary's custody from May 22 until June 2008. Mary explained that in 1995 she was arrested for driving under the influence with a child in the car, resulting in her conviction for child endangerment.

Mary further testified she had not seen any bruises on Elena, and was unaware of the domestic violence incident in May 2008. She believed the juvenile court previously intervened in 2006 because Elena was immature and jealous. Mary denied knowing Michael was physically abusive to Elena. She had never seen Michael hit Elena, but she would consider the possibility that domestic violence had occurred. Mary had not visited G.L. since she was placed in foster care.

Elena testified she voluntarily designated Mary as G.L.'s Indian custodian on May 22, and she signed the form in the presence of Mary and Michael. Elena rescinded the designation in October 2008, but now wanted Mary to be G.L.'s Indian custodian.

After considering the evidence and hearing argument of counsel, the court declared G.L. a dependent and removed her from parental custody under Welfare and Institutions Code section 361, subdivision (c) and 25 United States Code section 1912(e). The court disagreed with the position of Michael and the Viejas tribe that the jurisdictional findings must be vacated because Mary, as G.L.'s Indian custodian, was entitled to ICWA notice and appointment of counsel. The court noted Mary was no longer G.L.'s Indian custodian, and neither Mary nor the Viejas tribe had asserted her status before it was revoked.

The court declined to place G.L. with Mary, finding Mary was unlikely to adequately protect G.L., given her lack of insight regarding Michael's role in

the domestic violence between the parents. The court found G.L.'s current placement qualified as an Indian foster home and, even if it did not, there were no other Indian homes currently available for G.L.

## DISCUSSION

## I

## THE COURT AND AGENCY DID NOT VIOLATE ICWA'S NOTICE PROVISIONS FOR AN INDIAN CUSTODIAN

Michael contends the jurisdictional findings and dispositional order must be reversed because the court and Agency failed to comply with ICWA's notice requirements as to Mary, who was G.L.'s Indian custodian. He asserts that under state and federal law, Mary was entitled to notice of her rights to intervene in the proceedings and have counsel appointed.

## A

### *Rights of the Indian Custodian Under ICWA*

■ In 1978, Congress enacted ICWA in an effort to protect and preserve Indian tribes and their resources. (25 U.S.C. §§ 1901, 1902.) ICWA was specifically designed to help Indian children retain their familial, tribal and cultural ties. (*In re Robert A.* (2007) 147 Cal.App.4th 982, 988 [55 Cal.Rptr.3d 74].) It sets forth minimum federal standards for removing Indian children from their families and placing these children in foster or adoptive homes that reflect the unique values of Indian culture. (25 U.S.C. § 1902; *Mississippi Choctaw Indian Band v. Holyfield* (1989) 490 U.S. 30, 37 [104 L.Ed.2d 29, 109 S.Ct. 1597].) Consistent with Congress's goals, "[p]roceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in any individual case contrary to these preferences." (Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67584, 67586 (Nov. 26, 1979) (Guidelines).)

Among ICWA's procedural safeguards is the duty to inquire into a dependent child's Indian heritage and to provide notice of the proceeding to any tribe or potential tribes, the parent, any Indian custodian of the child and, under some circumstances, to the Bureau of Indian Affairs. ICWA's notice requirement provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the

party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or *Indian custodian* and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. . . . No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or *Indian custodian* and the tribe . . . ." (25 U.S.C. § 1912(a), italics added; see also Welf. & Inst. Code, § 224.2, subd. (a); Cal. Rules of Court,[1] rule 5.481(b); Guidelines, 44 Fed.Reg. at p. 67588.) The notice requirements of ICWA are mandatory and cannot be waived by the parties. (*In re Jennifer A.* (2002) 103 Cal.App.4th 692, 707 [127 Cal.Rptr.2d 54].)

ICWA defines " 'Indian custodian' " as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or *to whom temporary physical care, custody, and control has been transferred by the parent of such child.*" (25 U.S.C. § 1903(6), italics added; see Welf. & Inst. Code, § 224.1, subd. (a) [adopting ICWA's definition of "Indian custodian"].) In introducing the term "Indian custodian," the House report on ICWA explained the need to expand the definition beyond custody of an Indian child "with someone other than the parents under formal custom or law of the tribe or under State law . . . . [B]ecause of the extended family concept in the Indian community, parents often transfer physical custody of the Indian child to such extended family member on an informal basis, often for extended periods of time and at great distances from the parents. While such . . . custodian[s] may not have rights under State law, they do have rights under Indian custom which this bill seeks to protect, including the right to protect the parental interests of the parents." (H.R.Rep. No. 95-1386, 2d Sess. (1978), reprinted in 1978 U.S. Code Cong. & Admin. News 7530, 7543; see also *State ex rel. Juvenile Dept. v. England* (1982) 292 Ore. 545 [640 P.2d 608, 612].)

One particular concern of Congress "was the failure of non-Indian child welfare workers to understand the role of the extended family in Indian society." (*Mississippi Choctaw Indian Band v. Holyfield, supra,* 490 U.S. at p. 35, fn. 4.) " 'An Indian child may have scores of, perhaps more than a hundred, relatives who are counted as close, responsible members of the family. Many social workers, untutored in the ways of Indian family life or assuming them to be socially irresponsible, consider leaving the child with persons outside the nuclear family as neglect and thus as grounds for terminating parental rights.' " (*Ibid.*, quoting H.R.Rep. No. 95-1386, *supra*, reprinted in 1978 U.S. Code Cong. & Admin. News, at p. 7532.)

---

[1] Rule references are to the California Rules of Court.

■ ICWA's legislative history makes clear that "[t]he purpose of the Indian custodian status is to recognize and protect the practice of parents in many Indian communities who entrust their children temporarily to the care of extended family members and to mandate that such entrustment does not constitute abuse or neglect." (*Ted W. v. State of Alaska* (Alaska 2009) 204 P.3d 333, 338.) In this regard, an Indian custodian stands in the shoes of the parent and enjoys favored status under ICWA. (Native American Rights Fund, A Practical Guide to the Indian Child Welfare Act (2007) p. 37.) Like parents, Indian custodians are entitled to ICWA's protections, including notice of the pending proceedings and the right to intervene.[2] (25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.2, subd. (a); see Risling, Cal. Judges' Benchguide: The Indian Child Welfare Act (Cal. Indian Legal Services 2000) p. 20.) Additionally, an indigent parent or Indian custodian has a right to court-appointed counsel in a "removal, placement, or termination proceeding" (25 U.S.C. § 1912(b); see Welf. & Inst. Code, § 224.2, subd. (a)(5)(G)(v)) and the right to an additional 20 days to prepare for the proceeding. (Welf. & Inst. Code, § 224.2, subd. (a)(5)(G)(iii); rule 5.482(a)(3); Guidelines, 44 Fed.Reg. at p. 67589.)

■ Although ICWA provides for notice to the parent *or* Indian custodian, the Guidelines recommend notice be sent to both the parent *and* Indian custodian because doing so "is in keeping with the spirit of" ICWA. (Guidelines, 44 Fed.Reg. at p. 67589.) This is consistent with California law governing custody proceedings involving Indian children,[3] which provides for notice and other rights to both the parent *and* Indian custodian. (Welf. & Inst. Code, §§ 224.2, subd. (a), 224.4; rules 5.481(b)(1), (2), 5.482(e).)

---

[2] Under ICWA, "the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding." (25 U.S.C. § 1911(c).) Under California law, the child's parents, Indian custodians and tribe have an "absolute right" to intervene in the proceeding. (Welf. & Inst. Code, § 224.2, subd. (a)(5)(G)(i).) Notice requires a statement of "[t]he potential legal consequences of the proceedings on the future custodial and parental rights of the child's parents or Indian custodian." (*Id.*, § 224.2, subd. (a)(5)(G)(iv).) Allowing an Indian custodian to intervene "is necessary because foster care placements and/or termination of parental rights proceedings may forever alter the custodial rights of the Indian custodian and Congress believed it important that Indian custodians be treated similarly [to] parents in child custody proceedings." (Native American Rights Fund, A Practical Guide to the Indian Child Welfare Act, *supra*, at p. 47.)

[3] In California, ICWA "applies to all proceedings involving Indian children that may result in an involuntary foster care placement." (Rule 5.480.) This includes "detention hearings, jurisdiction hearings, disposition hearings, review hearings, hearings under [Welfare and Institutions Code] section 366.26, and subsequent hearings affecting the status of the Indian child." (Rule 5.480(1).)

B

*Mary Was G.L.'s Indian Custodian from May 22, 2008, to August 19, 2008*

Mary's status as G.L.'s Indian custodian was created by the parents' temporary transfer of G.L.'s physical care, custody and control under ICWA to Mary on May 22, 2008. The parties do not dispute that G.L. was in Mary's exclusive custody from May 22 until G.L. was taken into protective custody on June 18. The parents, who signed and submitted Designation of Indian Custodian forms, testified it was their intent to confer Indian custodian status on Mary.[4]

■ We disagree with Agency's assertion that the documents signed by the parents were insufficient to show Mary was G.L.'s Indian custodian. The statutory authority for designation of an Indian custodian by a parent does not require a writing. (25 U.S.C. § 1903(6).) As noted in the House report, a parent's temporary transfer of physical custody of an Indian child to extended family is often done on "an informal basis." (H.R.Rep. No. 95-1386, *supra*, reprinted in 1978 U.S. Code Cong. & Admin. News, at p. 7543.) We also disagree with Agency's assertion that a determination of Indian custodian status requires the court to consider the "nature, frequency, and duration" of contacts between the Indian child and his or her custodian. This position has no support in ICWA's language, legislative history or Guidelines, or in any published authority discussing Indian custodian status. Rather, the concept of the Indian custodian grew out of Congress's concern for the failure of administrative and judicial bodies "to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." (25 U.S.C. § 1901(5).) To impose standards regarding the nature, frequency, and duration of the Indian child's contacts with his or her Indian custodian would essentially ignore the critical role of extended family in Indian society, and thereby perpetuate one of the problems that Congress expressly sought to remedy by enacting ICWA.

As the juvenile court here noted, Elena had temporarily "signed over her rights under [ICWA] to the paternal grandmother[,] making her the Indian custodian." The record supports a finding that Mary was G.L.'s Indian custodian from May 22 to August 19, 2008, the date Elena revoked that status.

---

[4] We need not address Agency's argument that the parents' Indian custodian designation was a mechanism used solely to avert the court's intervention. Regardless of the parents' motivation, their temporary transfer of G.L.'s care and custody to Mary effectively created Indian custodian status.

C

*The Failure to Send Statutory Notice to Mary Did Not
Violate ICWA*

The record shows Mary was aware of the dependency proceedings because she attended the jurisdiction hearing on June 18. She did not inform the court or social worker that she had a Designation of Indian Custodian document signed by Elena. The court sustained the allegations of the petition and the proceedings concluded without the court or Agency ever knowing Mary was G.L.'s Indian custodian. Although Mary was not required or expected to understand the legal implications of ICWA, disclosure of her status as G.L.'s Indian custodian was a matter entirely within her control. Because the court and Agency did not know or have reason to know Mary was G.L.'s Indian custodian at the time of the jurisdiction hearing, they cannot be faulted for failing to provide her with notice under ICWA.

When Agency took G.L. into protective custody immediately following the jurisdiction hearing on June 18, Mary gave the social worker a Designation of Indian Custodian form, thus putting Agency on notice that she was G.L.'s Indian custodian. At that point, it was incumbent on Agency to provide ICWA notice to Mary as an Indian custodian, so that she could exercise her right to intervene and request appointment of counsel. (25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.2, subd. (a).) Agency offers no reason for its failure to notify Mary of her rights under ICWA as G.L.'s Indian custodian once it had this information.

The court first became aware of Mary's Indian custodian status at a hearing on July 10. Although the court acknowledged Mary was G.L.'s Indian custodian, it did not inquire whether Agency had sent Mary ICWA notice or order Agency to do so. Instead, it continued the date for disposition so Agency could file a Welfare and Institutions Code section 342 subsequent petition to seek G.L.'s removal from Mary's custody. Agency followed through and filed the subsequent petition, but again failed to send Mary the statutory notice to which she was entitled as an Indian custodian. Once the court and Agency knew of Mary's Indian custodian status, the responsibility for compliance with ICWA notice fell "squarely and affirmatively" on them. (*Justin L. v. Superior Court* (2008) 165 Cal.App.4th 1406, 1410 [81 Cal.Rptr.3d 884].)

However, the failure to send Mary statutory notice did not violate ICWA. Although the court should have earlier ensured compliance with ICWA notice requirements, Mary's status as G.L.'s Indian custodian was revoked on August 19. From the time the court and Agency learned of Mary's Indian

custodian status to the time that status was revoked, no hearing occurred that had an adverse impact on Mary's rights as an Indian custodian.

D

*Revocation Effectively Terminated Mary's Indian Custodian Status*

Michael contends the revocation of Mary's Indian custodian status was ineffective and thus, the ICWA notice violation continued throughout the proceedings, including the disposition hearing. He asserts: (1) Elena did not have the ability or authority to revoke Mary's Indian custodian status once G.L. was no longer in Elena's custody; and (2) he did not revoke his designation of Mary as G.L.'s Indian custodian.

■ The transfer of an Indian minor's care and custody to an Indian custodian is, by definition, "temporary," and thus revocable. (25 U.S.C. § 1903(6); Welf. & Inst. Code, § 224.1, subd. (a).) At the time Elena revoked Mary's Indian custodian status, Elena's parental rights remained intact and Elena retained legal custody of G.L., even though she did not have physical custody of her. Thus, Elena could properly revoke the transfer of G.L.'s care and custody to Mary.[5] Moreover, Elena's revocation was effective to terminate Mary's Indian custodian status, even without Michael's revocation. To conclude otherwise would have the unintended effect of allowing one parent to usurp the rights of the other parent with respect to an Indian child's temporary custody.[6] Once Mary's Indian custodian status was revoked, the notice provisions of ICWA no longer applied to her, regardless of Michael's intent to the contrary.

E

*Michael Was Not Prejudiced by the Lack of ICWA Notice to Mary*

To the extent Mary was entitled to ICWA notice before her Indian custodian status was revoked, any error was harmless. We agree with the line of cases holding a notice violation under ICWA is not jurisdictional in the fundamental sense, but instead is subject to a harmless error analysis. (See *In re Brooke C.* (2005) 127 Cal.App.4th 377, 384–385 [25 Cal.Rptr.3d 590];

---

[5] We need not address whether Elena was entitled to reinstate Mary as G.L.'s Indian custodian based on her testimony at the disposition hearing that she was willing to do so.

[6] Stated another way, an Indian custodian functions in lieu of a parent, not in addition to one.

*In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1410 [129 Cal.Rptr.2d 15].) "[T]o hold otherwise would deprive the juvenile court of all authority over the dependent child, requiring the immediate return of the child to the parents whose fitness was in doubt." (*In re Brooke C.*, at p. 385.) An appellant seeking reversal for lack of proper ICWA notice must show a reasonable probability that he or she would have obtained a more favorable result in the absence of the error. (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1162 [30 Cal.Rptr.3d 726]; *In re H.B.* (2008) 161 Cal.App.4th 115, 122 [74 Cal.Rptr.3d 27].)

Even had Mary received ICWA notice, intervened, and had counsel appointed before her Indian custodian status was revoked, substantial evidence supports a finding that the parents exposed G.L. to their substance abuse and ongoing domestic violence, and that G.L. was injured during a physical altercation on May 6, *before* Mary was her Indian custodian. Although G.L. was no longer in the parents' physical custody when the petition was filed, she remained at substantial risk of harm without the court's intervention. Contrary to Michael's position, the lack of ICWA notice to Mary did not undermine the validity of the court's jurisdictional findings or require the court to dismiss the petition. With the exception of the period when Mary was G.L.'s Indian custodian, the proceedings were conducted in accordance with ICWA and the court properly applied ICWA's substantive provisions. This is not a case where the court ignored a minor's Indian ancestry or deprived a tribe of its right to intervene. (*In re Nikki R.* (2003) 106 Cal.App.4th 844, 855 [131 Cal.Rptr.2d 256].) There is no reasonable probability the result would have been more favorable to Michael had Mary received ICWA notice. (See *In re Alexis H.* (2005) 132 Cal.App.4th 11, 16 [33 Cal.Rptr.3d 242] [defective ICWA notice was harmless error].) Further, given the unusual procedural posture in which we address the issue of notice to an Indian custodian, even a conditional reversal and remand for further ICWA notice would be futile, "an empty formality and a waste of ever-more-scarce judicial resources." (*In re E.W.* (2009) 170 Cal.App.4th 396, 402 [88 Cal.Rptr.3d 338].)

II

## THE COURT DID NOT VIOLATE ICWA'S PLACEMENT PREFERENCES

Michael challenges the sufficiency of the evidence to support the court's deviation from ICWA's placement preferences. (25 U.S.C. § 1915(b); Welf. & Inst. Code, § 361.31.) He asserts the court erred by not placing G.L. with Mary as an extended family member despite evidence that showed: (1) the parents wanted G.L. placed with her; (2) Mary was willing and able to

facilitate reunification between G.L. and Elena; (3) Mary was able to provide G.L. with a safe and secure home; and (4) Agency was unable to find a foster placement for G.L., other than Mary's home, approved by the tribe.

A

*ICWA's Placement Preferences and Standard of Review*

■ ICWA provides placement preferences and standards to be followed in foster care placements of Indian children. (25 U.S.C. § 1915.) Preference must be given, "in the absence of good cause to the contrary, to a placement with—[¶] (i) a member of the . . . child's extended family; [¶] (ii) a foster home licensed, approved, or specified by the . . . child's tribe; [¶] (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or [¶] (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the . . . child's needs." (25 U.S.C. § 1915(b)(i)–(iv).) "[T]he standards to be applied in meeting the placement preferences shall be the prevailing social and cultural standards of the Indian community where the parent or extended family resides or with which they maintain social and cultural ties." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1327 [84 Cal.Rptr.3d 841], citing 25 U.S.C. § 1915(d) & Welf. & Inst. Code, § 361.31, subd. (f).) The placement preference standards reflect the legislative goal of keeping Indian children with their extended families and preserving the connection between the child and his or her tribe when removal is necessary. (25 U.S.C. § 1901; Welf. & Inst. Code, § 224.)

■ In deciding whether good cause exists to deviate from the statutory placement preferences, the court should consider various factors set forth in ICWA's Guidelines, including: (1) the request of the biological parents; (2) the request of the child; (3) the extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness; and (4) the unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria. (Guidelines, 44 Fed.Reg. at p. 67594; Welf. & Inst. Code, § 361.31, subd. (h).) The burden is on the proponent of the good cause finding—here, Agency—to show there is an exception to the placement preferences. (*Fresno County Dept. of Children & Family Services v. Superior Court* (2004) 122 Cal.App.4th 626, 644 [19 Cal.Rptr.3d 155].)

In reviewing the court's good cause determination to bypass ICWA's placement preferences, we apply the substantial evidence test. (*Fresno County Dept. of Children & Family Services v. Superior Court, supra,* 122 Cal.App.4th at pp. 644–646.) Under this standard, we do not pass on the

credibility of witnesses, attempt to resolve conflicts in the evidence, or reweigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53 [82 Cal.Rptr.2d 426]; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610 [29 Cal.Rptr.2d 654].) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's findings. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947 [124 Cal.Rptr.2d 688].)

B

*Good Cause Existed to Place G.L. in an Indian Foster Home Instead of with Mary*

Here, substantial evidence supports the court's finding that good cause existed to deviate from ICWA's statutory placement preferences. The evidence showed that even though Mary had a relationship with G.L., had cared for her in the past and could maintain ties between G.L. and the Viejas tribe, she had been unable to protect G.L. from the parents' ongoing substance abuse and domestic violence. Mary had little or no insight into the effects of domestic violence on G.L., and denied Michael was violent toward Elena. Instead, Mary placed the blame on Elena. The court was entitled to disbelieve Mary's testimony that her relationship with Elena was amicable, and that Mary would consider Michael's culpability for the domestic violence and cooperate with Agency if the court placed G.L. with her. (See *In re Casey D., supra,* 70 Cal.App.4th at pp. 52–53.) Given the evidence of Mary's inability to provide G.L. with a safe, secure and stable home or to facilitate reunification between G.L. and Elena, good cause existed for the court to bypass the placement preference for Mary as G.L.'s extended family member.[7]

Further, the court recognized it could not place G.L. in an Indian foster home approved by the Viejas tribe because none existed. In accordance with ICWA's third level of placement preferences, the court placed G.L. in an Indian foster home approved by a non-Indian licensing authority, where she had been living since she was taken into protective custody. (See *In re K.B.* (2009) 173 Cal.App.4th 1275, 1290 [93 Cal.Rptr.3d 751] [placement of minor with Indian caregiver who was not member of minor's tribe satisfied requirements of ICWA].) The court also ordered Agency to continue searching for a foster home approved by the Viejas tribe, and to evaluate all relatives for placement. Substantial evidence supports the court's dispositional order.

---

[7] Contrary to Michael's argument, the court did not base its placement decision on Mary's 1995 conviction. Thus, any failure by Agency to inform Mary she could obtain a waiver of her conviction for purposes of placement is not relevant to the outcome of this case.

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and Huffman, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 2, 2009, S177285.